UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.:  1:24-cv-4775

JANE DOE 200,

     Plaintiff,

vs.

DARREN K. INDYKE AND RICHARD
D. KAHN AS CO-EXECUTORS OF
THE ESTATE OF JEFFREY E. EPSTEIN,

    Defendant.

_____/

## COMPLAINT

Plaintiff, Jane Doe 200, by and through her undersigned counsel, Edwards Henderson PLLC, files this Complaint against Darren K. Indyke and Richard D. Kahn as Co-Executors of the Estate of Jeffrey E. Epstein and alleges as follows:

## PARTIES

1.    Plaintiff, Jane Doe 200 (hereinafter "Doe") is currently a resident of the State of California.

2.    Plaintiff files this Complaint under a pseudonym to protect her identity because this Complaint makes allegations of a sensitive sexual nature, the disclosure of which, in association with her name, would cause further devastating harm to her.

3.    At all times material, Jeffrey Epstein was a citizen of the United States and a resident of the U.S. Virgin Islands.  Jeffrey Epstein was a man of extraordinary wealth who travelled between and stayed regularly in multiple residences, including in New York, New York (within the Southern District of New York) at 9 East 71st Street, New York, NY 10021.

1

4.      At all times material to this cause of action Jeffrey Epstein was an adult male born in 1953, who died on August 10, 2019.

5.      Defendant, Darren K. Indyke and Richard D. Kahn as Co-Executors of the Estate of Jeffrey E. Epstein ("Estate of Jeffrey E. Epstein") was opened and domiciled in the United States Virgin Islands, St. Thomas Division, and is the legal entity responsible for intentional, criminal, and/or tortious conduct committed by Jeffrey Epstein as described in this Complaint.

6.      At all times material to this cause of action, Jeffrey Epstein (legally represented now through Darren K. Indyke and Richard D. Kahn as Co-Executors of the Estate of Jeffrey E. Epstein) (referred to herein as "Estate of Jeffrey E. Epstein") owed a duty to Plaintiff to not commit intentional, criminal, fraudulent, or tortious acts against Plaintiff, including any acts that would cause Plaintiff to be harmed through conduct committed against her in violation of Common law battery, New York Penal Law section 130.20; or New York Penal Law 130.66; or New York Penal Law 130.35; or New York Penal Law 130.50; or New York Penal Law 130.52.

## JURISDICTION, VENUE, AND TIMELINESS

7.      This Court has jurisdiction over the dispute pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) as Plaintiff and Defendant are citizens of different states and/or jurisdictions and the amount in controversy exceeds $75,000.00 exclusive of interests and costs.

8.      This Court has personal jurisdiction over the Defendant as a substantial part of the acts, events, and omissions giving rise to this cause of action occurred in the Southern District of New York.

9.      Venue is proper in this Court as the cause of action arose within the jurisdiction of this Court.

10.     Plaintiff and Defendant entered into a Tolling Agreement prior to the filing of this action. Pursuant to the terms of that Agreement, the parties agree that this action has been timely filed pursuant to the applicable law governing each individual cause of action under New York's Adult Survivor's Act, N.Y. CPLR § 214-j.

## FACTUAL ALLEGATIONS

### Jane Doe 200 was Subjected to N.Y. Penal Law § 130 Crimes.

11.     In 2000, Doe met Jeffrey Epstein in Los Angeles, California through a friend.

12.     Although Epstein's sex trafficking enterprise has since been widely reported, Doe was unaware of his criminal behavior when she met him and throughout her brief romantic relationship with him.

13.     During their first meeting, Epstein asked Doe about her interests and passions, and by all accounts seemed genuinely interested in her life. He made it clear that he was a well-connected person and offered to introduce her to world-renowned scientists and other professionals in fields in which Doe was interested.

14.     Doe's friend spoke highly of Epstein and Doe was intrigued by him.

15.     Shortly after meeting in Los Angeles, Epstein invited Doe and her friend to visit Epstein's Island in the United States Virgin Islands, which they did.

16.     In the beginning, Doe's relationship with Epstein was purely platonic.

17.     As Epstein got to know Doe, they began discussing her desire to go to school to get her MBA. Epstein advised her that he would help her with admissions before instructing her to visit the NYU and Columbia business schools. He informed Doe that she could stay in one of his apartments in New York City during her visit.

18.     In 2001, Doe then began dating Jeffrey Epstein, spent considerable time traveling with him, and believed they were in an exclusive relationship.

19.     Epstein and Doe's relationship was traditional in many respects, as she was introduced to Epstein's brother and mother, as well as his closest friends.

20.     In addition to travelling together, Doe and Epstein went on dates such as to auction houses, antique shops, drives around town and even a helicopter trip to Princeton University to attend a lecture by Epstein's close friend, Professor Martin Nowak.

21.     Far from being the serial sex offender the world knows Epstein to be now, Epstein told Doe that he had only had sex with five women in his entire life and named them for Doe.  One of those women was his former girlfriend, Ghislaine Maxwell, who was around frequently although at this point in time Epstein considered Maxwell only a friend.

22.     To Doe, Epstein appeared as a kind, generous, and faithful boyfriend.

23.     The more time Doe spent with Epstein, the more people Epstein introduced her to, and the more Doe learned about the powerful and influential connections Epstein had.

24.     Epstein name-dropped frequently, bragging about his connections at top of every industry, from influential political figures nationally and internationally, to billionaire businessmen to notorious international criminals.

25.     It became obvious that Epstein was not only extremely wealthy but also suspiciously well-connected, more so than all the other powerful men with whom he associated.

26.     Despite being in a committed relationship often spending nearly around-the-clock time together, what Epstein did for work was not clear.

27.     While Epstein claimed to be a financial advisor of sorts, he and his confidant, Ghislaine Maxwell, more than hinted that Epstein was not a typical businessman.

4

28.     Epstein and Maxwell, together and separately, repeatedly told Doe about Epstein's power and connections, and expressed that Epstein was not someone to cross.

29.     On numerous occasions Doe was told that Epstein was much more powerful than she could ever imagine and Maxwell specifically warned Doe that it was not good to be Epstein's enemy.

30.     Doe was told that Maxwell's father, Robert Maxwell, was in the Mossad[1] and Doe was led to believe by both Maxwell and Epstein that Epstein was as well, further demonstrating the unique power and connections that Epstein possessed.

31.     Epstein himself praised Robert Maxwell as an exceptional Mossad agent while also weaving in stories about his own personal and business relationships with powerful and diverse individuals, from presidents, to the intelligence community, to an infamous arms dealer.

32.     Not only did Epstein hint at being a Mossad agent, but he also further demonstrated his power and unique connections by boasting that he was a member of the Trilateral Commission and a member on the Council on Foreign Relations, always in the context of portraying himself as one of the most influential men in the world. While he was gentle and kind to Doe most of the time, Doe did observe Epstein's explosive, uncontrollable anger toward others.

33.     Throughout their relationship, Doe was led to believe she was in a committed, monogamous relationship with Epstein, and they interacted as boyfriend and girlfriend, until the day in 2001 when Epstein forcibly raped her in his New York townhouse.

34.     Epstein's manipulation and eventual rape of Doe was different from his now widely reported *modus operandi* with respect to his abuse of young girls and women. The manner of operation for Epstein's usual sexual abuse would typically start by luring young girls or women to

---

[1] Mossad is the national intelligence agency of the State of Israel.

one of his luxurious mansions, under the guise of being a wealthy philanthropist able to pay cash for massages, advance careers, or provide other life necessities. Once inside the mansion, Epstein would force his soon-to-be victims into providing a massage that would turn sexual, and from there, would cause each of his unsuspecting victims to engage in a variety of commercial sex acts.

35.    However, with respect to Doe, Epstein infiltrated her life in a unique and arguably more disturbing way. Epstein over the course of months, caused Doe to believe they were in a committed relationship, that she was one of the only real girlfriends he had ever had, and that he cared for her. Once he knew Doe felt the same way, he forcibly raped her.

36.    In the fall of 2001, Doe was in the 9 East 71 Street massage room talking to Epstein while he was getting a traditional massage.  Doe was fully clothed and nothing sexual was occurring at all. Suddenly, the masseuse started kissing Epstein in front of Doe, who was shocked and confused, as this was entirely inconsistent with their relationship.

37.    When Doe saw Epstein kiss another woman, she instantly became upset and began walking out of the room.

38.    Before she was able to leave the room, Epstein came up behind Doe, grabbed her and pulled her pantyhose down before he physically forced her face down on the massage table and violently vaginally penetrated her.

39.    While Epstein was forcibly raping Doe, Doe was begging him to stop and fighting him off until finally she was able to get him off her so that she could run out of the room, down the stairs, and out of the front door of the townhouse, never to return.

40.    Given the violence behind the rape, Doe knew in that moment that she had to escape. Having seen Epstein's extraordinary power first-hand and heard even more about the

extent of his power from Maxwell, Doe knew that she could not report him to the police without risking fatal retaliation. Doe returned to California and attempted to avoid Epstein entirely.

41.     Doe genuinely believed that any reporting of the rape by what she believed to be a Mossad agent with some of the most unique connections in the world, would result in significant bodily harm or death to her.

42.     After being raped by Epstein, Doe immediately ended her romantic relationship with Epstein.

43.     Over the next two years, Epstein attempted to contact Doe frequently to try to lure her back into his life; however, Doe refused to answer.

44.     In 2003, nearly two years after the rape, Epstein reached out to Doe again regarding a networking event that he described as a "once in a lifetime opportunity" that would allow Doe to network with some of the most influential individuals in the world.

45.     While Doe had no desire to ever speak to Epstein again, her immigration issues at the time made this an opportunity she could not pass up, regardless of who the invitation was coming from.

46.     Doe, while hesitant to be in Epstein's orbit again, attended the networking event purely for work purposes.

47.     After meeting several well-known individuals at the event such as Larry Page and Sergey Brin, Epstein told Doe that several of these people were spending the next few days at his ranch in New Mexico and that if she attended, she would have a chance of potentially working with one of these people.

48.     Knowing that she would stay far away from Epstein regardless of any attempted advances, Doe went to Epstein's New Mexico ranch along with some of Epstein's friends.  Doe made sure Epstein was not given the opportunity to abuse her again while there.

49.     Doe frequently continued to be contacted by Epstein, and despite her belief that Epstein could harm or kill her if he did not get his way, given the immense harm he inflicted on her, she refused to ever see him again.

## COUNT I
## BATTERY/VIOLATION OF SECTION 130
## AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS CO-EXECUTORS OF
## THE ESTATE OF JEFFREY E. EPSTEIN

50.     The Plaintiff adopts and realleges paragraphs 1 through 49 above.

51.     The intentional acts of Jeffrey Epstein against Jane Doe 200 constitute a battery and a sexual offense as defined in New York Penal Law § 130, including but not limited to the following:

    a.  Sexual misconduct as defined in §130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff without Plaintiff's consent;

    b.  Rape in the first degree as defined in §130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff by forcible compulsion;

    c.  Forcible touching as defined in §130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged in the forcible sexual touching of Plaintiff's sexual or intimate parts for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire;

    d.  Sexual abuse in the third degree as defined in § 130.55 inasmuch as Jeffrey Epstein subjected Plaintiff to sexual conduct without her consent; and

    e.  Sexual abuse in the first degree as defined in §130.65 inasmuch as Jeffrey Epstein subjected Plaintiff to sexual contact by forcible compulsion.

52.     As a direct and proximate result of Jeffrey Epstein's violations of New York Penal Law § 130, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical

injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

53.     This cause of action is timely under the Adult Survivors Act N.Y. C.P.L.R. § 214-j (McKinney 2022), because this battery arises out of conduct perpetrated against Plaintiff who was eighteen or older at the time of the conduct, that constitutes a sexual offense as defined in Article One Hundred Thirty of the New York Penal Law.

WHEREFORE, Plaintiff demands judgment against Darren K. Indyke and Richard D. Kahn as Co-Executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT II
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS CO-EXECUTORS OF
### THE ESTATE OF JEFFREY E. EPSTEIN

54.     The Plaintiff adopts and realleges paragraphs 1 through 49 above.

55.     Jeffrey Epstein violently sexually abused Jane Doe 200.

56.     Jeffrey Epstein's intentional conduct was extreme and outrageous, endangered Plaintiff's physical safety, and caused severe and lasting emotional distress and serious injuries to Plaintiff's mental health.

57.     Jeffrey Epstein's conduct of forcibly and violently sexually assaulting Jane Doe 200 is conduct that shocks the conscience.

58.     Jeffrey Epstein's actions were committed with intent to cause severe emotional distress.

59.     As a direct and proximate result of Jeffrey Epstein's violations of New York Penal Law § 130, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages.  Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

60.     This cause of action is timely under the Adult Survivors Act N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff who was eighteen or older at the time of the conduct, that constitutes a sexual offense as defined in Article One Hundred Thirty of the New York Penal Law.

WHEREFORE, Plaintiff demands judgment against Darren K. Indyke and Richard D. Kahn as Co-Executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 24, 2024.

Respectfully Submitted,
EDWARDS HENDERSON

By: */s/ Bradley Edwards*

Bradley J. Edwards
Brittany N. Henderson
425 N. Andrews Ave. Suite 2
Fort Lauderdale, FL 33301
(954)-524-2820
Fax: (954)-524-2822
Email: brittany@cvlf.com
        brad@cvlf.com
        ecf@cvlf.com

*Attorneys for Plaintiff*